## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **ORBITAL ENERGY GROUP, INC.** | § | |
| **f/k/a CUI GLOBAL, INC.;** | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No.** |
| | § | |
| **v.** | § | |
| | § | |
| **BRANDON S. MARTIN SR.** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Orbital Energy Group, Inc. f/k/a CUI Global, Inc. ("OEG") ("Plaintiff") hereby files this Original Complaint asserting numerous causes of action against Brandon S. Martin Sr. ("Martin" or "Defendant") for among others, fraud and breach of contract in connection with OEG's purchase of Reach Construction Group, LLC.

## I.     INTRODUCTION

1.     Defendant Martin is the former owner of Reach Construction Group, LLC ("Reach Construction" or the "Company"). During negotiations with OEG for the purchase of Reach Construction, Martin made several misrepresentations and/or failed to disclose material and relevant information about the Company – all in a fraudulent effort to inflate the value of the Company's assets and to induce surreptitiously OEG's purchase of Reach Construction under false pretenses. This suit seeks past and current damages sustained by OEG stemming from Martin's misconduct and wrongdoing.

## II.    PARTIES AND SERVICE

2.    Orbital Energy Group, Inc. is a Colorado corporation with its principal place of business in Houston, Texas. Orbital Energy Group, Inc. used to be known as CUI Global, Inc. ("CUI"). CUI changed its name to Orbital Energy Group, Inc. on approximately May 8, 2020.

3.    Upon information and belief, Martin is an individual North Carolina resident who resides in Lee County, North Carolina, at 4361 Farrell Rd., Sanford, NC 27330. Martin may be served personally at his residence or wherever else he may be found.

4.    Upon information and belief, Reach Construction Group, LLC is a former North Carolina limited liability corporation with a former principle place of business at 2400 Reliance Avenue Suite B Apex, North Carolina. Martin previously maintained a 100% ownership interest in Reach Construction. On approximately January 26, 2021, Reach Construction changed its name to Orbital Solar Services, L.L.C. ("Orbital Solar").  Orbital Solar is a subsidiary of Orbital Energy Group, Inc.

## III.    JURISDICTION AND VENUE

5.    OEG and Martin entered into an Equity Purchase Agreement ("Agreement") for the sale of Reach Construction to OEG with a purchase price of $67,000.000.00. (Exhibit A).

6.    As set forth in Section 7.11 of the Agreement, the parties agreed to be bound by the jurisdiction of, and that venue would be proper in, this Court.  To wit:

**Section 7.11 Submission to Jurisdiction.** Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions described herein . . . shall **only** be instituted in the United States District Court of the Northern District of Texas (Dallas Division) or the Civil District Courts of the State of Texas in Dallas County, Texas, and each party hereto irrevocably submits to the exclusive jurisdiction of such courts in any suit, action or proceeding and each party hereto and each of their respective Affiliates irrevocably and expressly agrees that it and they are subject to the jurisdiction of the United States District Court of the Northern District of Texas (Dallas Division) or the Civil District Courts of the State of Texas in Dallas County, Texas and shall not assert an objection to such exclusive

jurisdiction, including any objection to personal jurisdiction. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding be brought in any such court that has brought in an inconvenient forum.

Exhibit A, Section 7.11 (emphasis added).

7.     The Court possesses subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The parties are diverse citizens and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Texas law governs the construction and enforcement of the Agreement. (Exhibit A, Section 7.10).

## IV.   FACTS

9.     OEG is a publically traded company dedicated to the acquisition and development of innovative companies, products and technologies.  It maintains several divisions in the energy sector – including gas, power, and solar initiatives – as well as telecom-related services.

10.    In late 2019, Martin approached James F. O'Neil ("O'Neil") – OEG's Vice Chairman and Chief Executive Officer, about potentially investing in Reach Construction.

11.    Reach Construction was a privately-held engineering, procurement and construction company focused on solar construction in North America.  At that time, it claimed to have executed upon 40 different renewable energy projects and had developed deep expertise in utility-scale renewable energy product delivery, particularly solar farms, site preparation and public utility construction.

12.    O'Neil and Martin were previously acquainted through mutual contacts in the construction industry and, in particular, the energy sector for which O'Neil has extensive expertise and experience.

13.     Indeed, O'Neil previously took on a mentorship role with Martin – attempting to assist Martin with breaking into the energy sector and growing his business. Doing so, O'Neil regularly acted as a sounding board for Martin's initiatives and made several introductions for Martin to potential investors and clientele.

14.     After Martin's solicitation to O'Neil, O'Neil notified Martin that OEG was interested in further exploring investment opportunities in Reach Construction.

15.     Ultimately, OEG and Martin decided that OEG's acquisition of Reach Construction might be amenable to both parties and, accordingly, the parties began negotiating the terms of a purchase agreement.

<u>Negotiations for and Purchase of Reach Construction</u>

16.     During negotiations of the purchase agreement for Reach Construction, OEG requested certain information from Martin to conduct its own due diligence.

17.     On or about January or February 2020, OEG requested that Martin provide it with financial information showing Reach Construction's expected income for fiscal year 2020 (January 1 to December 31).

18.     In response, Martin provided an accounting (which he prepared himself) of expected revenues and profits the Company anticipated in fiscal year 2020. Those figures were based on approximately 30 projects Reach Construction had in its "pipeline."  (*See* Exhibit B, hereafter "First Accounting").

19.     The anticipated revenues for these projects – as represented by Martin to OEG – were over $129,000,000.00 and total profit earnings over $30,000,000.00 in 2020 alone. (*Id.*).

20.     After reviewing the First Accounting, OEG requested that Martin provide it with a second accounting of anticipated revenues and profits showing only those projects that were under contract with a customer and that were certain to occur within fiscal year 2020.

21.     The purpose of this request was to ensure OEG obtained an accurate accounting of those revenues that were, in fact, contracted with the Company and to ensure it obtained an accurate forecast.

22.     Martin provided this second accounting (also prepared by him), which showed anticipated revenues in excess of $70,000,000.00 with total profit earnings exceeding $11,000,000.00 based on 29 contracted projects. (*See* Exhibit C, hereafter "Second Accounting").

23.     During the negotiation period between OEG and Martin, Martin never identified potential lawsuits or other disputes related to any of the projects currently being processed by Reach Construction with its customers.

24.     To be sure, Martin never identified any project that was suffering from significant delays or other operational issues that threatened the viability of Reach Construction's continued involvement in the project.

25.     Importantly, Martin never disclosed any complaints or demands from subcontractors or vendors related to unpaid invoices for services rendered or products delivered.

26.     Nor did he otherwise mention any formal or informal demands for payment by any creditor, subcontractor or vendor related to liabilities owed by Reach Construction.

27.     Based on the material representations made by Martin in the Second Accounting, and that he never mentioned any pending litigation, disputes, or other informal demands for payment of liabilities owed by Reach Construction to third-parties, OEG agreed to purchase Reach Construction from Martin for a total value of $67,000,000.00.

28.     The parties reached the purchase price sum based on a multiple of the profits Martin projected and identified in the Second Accounting – which he compiled himself.

### The Purchase Agreement

29.     Martin and OEG executed the Agreement on or about April 1, 2020.

30.     Pursuant to the terms of the Agreement, the purchase price was secured by: (1) the issuance of 2,000,000 shares of OEG's common stock (which remained restricted for one (1) year); (2) a $5,000,0000 subordinated promissory note payable from OEG's predecessor, CUI, to Martin over a period of eighteen (18) months; (3) $30,000,000 in a three-year subordinated promissory note payable over a three-year (3) period subject to a working capital adjustment; and (4) a $30,000,000 "earn out" term subject to a final adjusted EBITDA threshold calculation. (Exhibit A, Sections 1.02-1.04 and Exhibit C thereto).[1]

31.     Other terms of the Agreement that are germane to this action, among others, are as follows:

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF COMPANY

Seller represents and warrants to Buyer that the statements in this ARTICLE III are true and correct as of the Closing Date.  For purposes of this ARTICLE III, "Seller's knowledge," "knowledge of Seller" and any similar phrases shall mean the actual knowledge of seller.

                    *           *           *

**Section 3.06 Financial Statements**.

                    *           *           *

---

[1] A separate Bridge Note was extended to Martin to settle certain affairs on behalf of Reach Construction in the amount of $3,000,000.00, which was repayable to Reach Construction (now Orbital Solar). (Exhibit A, Section 1.02(b)(i)). None of that note has been repaid.

(c)     There are no material liabilities of Company other than (i) those reflected on the Financial Statements, (ii) those incurred in the ordinary course of business since December 31, 2019, and (iii) those incurred in connection with this Agreement, the documents to be delivered hereunder or the transactions described herein.

**Section 3.07 Material Contracts.** Neither Company nor any other party thereto, to Seller's knowledge, is in material breach of or material default under (or is alleged to be in material breach of or material default under), or has provided or received any notice of any intention to terminate, any contract or agreement material to the Company.  To Seller's knowledge, no event or circumstance has occurred that, with or without notice or lapse of time or both, could constitute an event of default under any Material Contract or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.  Complete and correct copies of each contract or agreement material to the Company have been made available to Buyer.  To Seller's knowledge, there are no disputes pending or threatened under any Material Contract.

*          *          *

**Section 3.11 Legal Proceedings.**  There is no, and since January 1, 2017 there has not been any, claim, demand, action, suit, proceeding, audit, litigation or investigation of any nature (whether civil, criminal, administrative, regulatory or otherwise, whether in law or in equity) ("Action") pending or, to Seller's knowledge, threatened against or by Company that either (a) relates or affects Company and, to Seller's knowledge, involves a dispute, or is reasonably expected to result in a liability, of more than $100,000; or (b) challenges or seeks to prevent, enjoin or otherwise delay the transactions described in this Agreement. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

*          *          *

**Section 3.26 No Misstatement of Material Fact.** No other information provided by or on behalf of Seller to Buyers which is not included in the documents contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in light of the circumstance under which they are or were made, not misleading.

Exhibit A.

## Subsequent Discoveries of Misconduct and Fraud

32.     As part of the purchase, Martin became Orbital Solar's Chief Executive Officer and executed a written Executive Employment Agreement ("Executive Agreement").

33.     OEG expected Reach Construction to perform according to the representations made by Martin about the Company's contracted project projections and the fact that it possessed no undisclosed liabilities.

34.     Instead, OEG discovered numerous deficiencies with the financial well-being of the Company.

35.     Indeed, many of the projects listed in the Second Accounting provided by Martin were not, in fact, under contract as represented.

36.     To be sure, most of the projects listed in the Second Accounting were not under contract with Reach Construction at the time of the purchase by OEG.

37.     That all 29 projects were not under contract also meant the profit margin projections – upon which OEG based its offer – were not anywhere near in excess of $11,000,000.00 for 2020 as Martin claimed.

38.     OEG also discovered that the projects that were, in fact, under contract were nevertheless "underwater" as they had been mismanaged by Reach Construction under Martin's leadership.

39.     Specifically, the projects either were in disarray due to operational failures (e.g., failure to purchase supplies to complete the job, failure to complete accurate topologies for installation purposes) or were otherwise understaffed or staffed by incompetent personnel.

40.     Compounding these issues, OEG learned that numerous of the subcontractors and vendors supporting these projects had not been paid for outstanding invoices provided to Reach Construction – despite numerous requests for payment directly to Martin himself.

41.     These unpaid subcontractors and vendors included contract labor – at least one of which placed liens on customer projects for the unpaid sums – which only aggravated already delayed installation timelines.

42.     As a result of these issues – Reach Construction a/k/a Orbital Solar was sued by countless vendors and subcontractors for delinquent liabilities that accrued when Martin owned Reach Construction.

43.     Likewise, numerous customers fired Orbital Solar from projects because of missed project deadlines that were exacerbated by the state of affairs upon which Martin continued to operate the Company after the acquisition.

44.     Importantly, none of these issues (e.g., missed project deadlines, unpaid invoices, existing liabilities, etc.) were identified to OEG during the negotiation process of the purchase price for Reach Construction.

45.     When OEG first learned about these delinquencies, William J. Clough ("Clough") (OEG's Executive Chairman and CLO) and O'Neil approached Martin to discuss the issue.

46.     In response to Clough and O'Neil's demand for an explanation, Martin told them that he did not believe the demanded sums by subcontractors and vendors were "liabilities" he was required to disclose during negotiations over the Agreement because the sums had not yet been – at the time of the purchase – demanded in formal litigation against Reach Construction.

47.     After Clough and O'Neil explained to Martin that these kinds of liabilities were, in fact, required to be disclosed during the negotiations (by both common sense and the terms of the Agreement), they asked Martin if there were any other similar, outstanding liabilities.

48.     In response, Martin told Clough and O'Neil he was unaware of any other such liabilities.

49.     That statement was false and Martin knew it was false when he made it.

50.     To be sure, OEG subsequently received numerous formal and informal demands to settle unpaid invoices and liabilities owed by Reach Construction (from before the acquisition) to various vendors and subcontractors.[2]

51.     As a result of these demands, OEG has agreed to pay over $12,000,000.00 in settlement sums to resolve threatened and actual litigation brought by vendors and subcontractors related to Martin's failure to pay delinquent invoices and other related liabilities owed by Reach Construction.[3]

52.     None of these liabilities were ever disclosed to OEG by Martin during the negotiations in any verbal or written communication.

53.     In fact, each and every time a new demand surfaced, Martin – *for the first time* – recalled the unpaid sum, claimed he did not understand the liability should have been disclosed during negotiations, and confirmed no other similar liabilities were outstanding.

54.     Each and every time, however, OEG received yet another demand for an unpaid liability Reach Construction had not extinguished prior to the sale and for which Martin failed to disclose – either during negotiations or thereafter when he was requested to do so by Clough and O'Neil.

---

[2] That is true even though OEG provided to Martin the $3,000,000.00 Bridge Note, which was earmarked for the very purpose of unencumbering a few projects to ensure they could continue forward and be completed during 2020. Martin informed Clough and/or O'Neil that he could not account for over $1,500,000.00 of the loaned money – claiming it was embezzled by a former accountant.  Notwithstanding, Martin never made any attempt to secure or otherwise aid Orbital Solar with recovering this allegedly stolen sum of money.

[3] In fact, one such liability involved a personal guarantee by Martin for which a customer issued a lien on his home. OEG agreed to resolve that issue – amounting to more than $3,000,000.00 – based on Martin's representation that no additional liabilities were outstanding.

55.     Accordingly, each and every time Martin engaged in this misconduct, he further defrauded OEG; leading it to believe that he had finally disclosed - as a senior member of Orbital Solar - that Orbital Solar was free from all other liabilities not previously disclosed or otherwise factored into the sale price of Reach Construction.

56.     Adding insult to injury, OEG was also required to invest approximately $2,500,000.00 per quarter into Orbital Solar to ensure its viability as an ongoing entity because it was in such dire financial hardship under Martin's leadership.

57.     To date, OEG has infused approximately more than $15,000,000.00 into Orbital Solar for that very purpose.

58.     Moreover, in response to the questions from Clough and O'Neil about the undisclosed liabilities, Martin also promised them – as a way to divert attention from his misconduct – he was securing a partnership with Akon Lighting Inc.[4] and, in particular, it's Black Sunrise Half Century Fund[5] – which would reap significant revenues for Orbital Solar in amounts upwards of $725,000,000.00.

59.     Doing so, Martin explained that through the Black Sunrise Fund, he had partnered with Akon Lighting, Inc. to re-develop a number of decommissioned coal-fired power plants throughout the United States in favor of converting them to utility-scale solar energy farms.

---

[4] Upon information and belief, Akon Lighting, Inc. was launched by Aliaune Damala Badara Akon Thiam – a singer, songwriter, record producer, and entrepreneur popularly known as "Akon."

[5] The Black Sunrise Half Century Fund is also referred to as the Black Sunrise Fund and is a national initiative to help bridge the gap between the black community and clean energy opportunities – while making a significant impact on social and income equality and industrial sustainability. *See https://www.prnewswire.com/news-releases/akon-lighting-inc-announces-partnership-between-the-black-sunrise-fund-and-uk-based-growmore-group-301256932.html*

60.     Martin buttressed his representations about this venture with the fact that Orbital Solar would become Akon Lighting, Inc.'s preferred engineering, procurement, and construction vendor.[6]

61.     In order for the venture to move forward, however, Black Sunrise Fund required investors.

62.     As such, Martin repeatedly represented to Clough and O'Neil that he was in the process of securing various investors (including professional athletes and Hollywood stars) to make the venture profitable.

63.     Despite these representations about the viability of the Black Sunrise Fund's promise for Orbital Solar's business – most of which conveniently coincided with Clough and/or O'Neil's notification to Martin that yet another newly discovered liability had been identified by a subcontractor or vendor who had not been paid by Reach Construction – OEG ultimately learned that the Black Sunrise Fund was not capitalized at all.

64.     OEG also learned that many of the targeted coal plants Martin claimed would be part of the conversion project with Black Sunrise Fund had recently secured five (5)-year purchase agreements for fossilized fuels.[7]

_____

[6] Akon – believed to be the founder of Akon Lighting, Inc. – unilaterally announced this very partnership on January 19, 2021 during his opening remarks at President Biden's "Clean Energy for America" Inaugural Ball.  No one at OEG (other than perhaps Martin) was aware Akon planned to announce the partnership at that time – nor had OEG and Akon Lighting ironed out any details of the arrangement or otherwise entered into any memorandums of understanding or contractual agreements. Nevertheless, OEG issued a press release recounting the announcement on January 25, 2021.

[7] In the coal industry, it is common for coal plants to purchase fossilized fuels well in advance of their ultimate use.

_____

65.     As such, it became clear to OEG that Martin had proverbially "strung it along" with the prospects of a non-existent profitable venture in order to – hopefully – dissuade OEG from taking efforts to recoup the money it had already paid Martin for a business Martin fraudulently induced it to purchase based on faulty projections he knew were inaccurate at the time he provided them and for which he failed to disclose numerous liabilities.

66.     Indeed, the coal plants that had secured purchase agreements for 5 years would not be converting to solar energy anytime soon and, to wit: upon information and belief, the Black Sunrise Fund has yet to secure any investor funding.

67.     OEG made payments to Martin pursuant to the terms of the $5,000,000.00 subordinated promissory note provided in the Agreement until April 2022 when he was terminated from Orbital Solar's employment.

## V.     CAUSES OF ACTION

### A.     Fraud

68.     The preceding paragraphs are incorporated by reference as if fully set forth therein.

69.     Martin overtly defrauded OEG by making false representations about the status of Reach Construction's assets and projects under contractual arrangements at the time of the purchase.

70.     The elements of fraud are: (1) a material representation of fact; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intent that another party should act upon it; (5) that party then acted in reliance on the representation; and (6) thereby suffered injury. *See Italian Cowboy*

*Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (*citing Aquaplex, Inc. v. Rancho La Valencia, Inc*., 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)).

71.     As explained above, Martin provided materially misleading information about both (1) the number of projects held "in contract" or which were to be completed in fiscal year 2020 and (2) the value of those projects as outlined in his Second Accounting.

72.     Martin misrepresented in the Second Accounting that Reach Construction possessed 29 projects under contract that would be completed in fiscal year 2020, which would provide revenues and profits exceeding $70,000,000.00 and $11,000,000.00 respectively.

73.     Martin knew at the time of these representations that many of the projects listed in the Second Accounting were not actually under contract (or at a minimum recklessly made them without knowledge of their truth).

74.     Martin also knew that many of the contracted projects had no hope of turning a profit because they had been mismanaged and/or his accounting did not account for unpaid invoices to vendors and subcontractors.

75.     To date, none of the projects have turned a profit.

76.     Importantly, OEG relied on the figures announced by Martin in the Second Accounting to value Reach Construction at $67,000,000.00 – a figure directly extrapolated from a multiple of the profits Martin claimed would occur in fiscal year 2020.

77.     In reality, Reach Construction was worth much less as the Company's purported profits for fiscal year 2020 were built on false and materially omitted information.

78.     Martin's representations were made with the intent that they should be acted upon by OEG.

79.     OEG acted in reliance on Martin's representations and thereby suffered injury.

80.     Specifically, as a result of Martin's fraud, OEG has sustained substantial injury for which it seeks monetary relief in the form of damages (both actual and consequential) in an amount to be determined by the trier of fact.

### B.     Fraud by Non-Disclosure

81.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

82.     Martin concealed from or failed to disclose to OEG material facts which Martin had a duty to disclose.

83.     Martin knew at the time of the sale that many third parties were owed money by Reach Construction for services and products provided to the Company related to ongoing projects Reach Construction was managing for its customers.

84.     Martin also knew at the time of the sale that these third parties had issued demands for payment that had gone unanswered and that they continued to seek payment for their services.

85.     None of these liabilities were disclosed to OEG.

86.     Martin knew OEG did not know the truth about these liabilities and did not have an equal opportunity to discover them.

87.     To be sure, despite having a duty to disclose the liabilities by virtue of the sales negotiations Martin and OEG were in, Martin was deliberately silent about the liabilities from which Reach Construction suffered.

88.     By failing to disclose this information, Martin intended to induce OEG to purchase Reach Construction at an inflated price and under false pretenses.

89.     OEG relied on Martin's nondisclosures and, as a result of acting without knowledge of the undisclosed facts, OEG has suffered damages.

90.     Fraud by non-disclosure is a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts. *Smith v. National Resort Communities, Inc.,* 585 S.W.2d 655, 658 (Tex. 1979).

91.     To establish fraud by non-disclosure, OEG must show Martin: (1) concealed or failed to disclose a material fact within its knowledge that it had a duty to disclose; (2) knowing OEG was ignorant of the facts and did not have an equal opportunity to discover the truth; (3) with the intent to induce OEG to act, and; (4) OEG suffered injury as a result of it acting without knowledge of the undisclosed facts. *Nichols v. YJ USA Corp.,* 2009 WL 722997 at *18 (N.D. Tex. Mar. 18, 2009); *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.,* 245 S.W.3d 488, 507 n.27 (Tex. App. -- Houston [14th Dist.] 2007, *pets. filed*); *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 181 (Tex. 1997).

92.     A representation is material if "a reasonable person would attach importance to it and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323 (Tex. 2011).

93.     Although OEG undertook extensive due diligence during the negotiations process with Martin, it did not have a duty to use due diligence *to discover whether the representations by Martin were fraudulent. Koral Indus. v. Security-Conn. Life Ins*., 802 S.W.2d 650, 651 (Tex. 1990).

94.     Stated differently, Martin cannot assert that OEG could have discovered the truth by exercising proper care to avoid liability for his misconduct. *Id.*

95. Generally, the failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Bradford v. Vento,* 48 S.W.3d 749, 755 (Tex. 2001); *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex. 1998).

96. Texas Courts have found a duty to speak in certain circumstances like this, specifically where: (1) one who voluntarily discloses information has a duty to disclose the whole truth; (2) one who makes a representation has a duty to disclose new information when he is aware that the new information makes the earlier representation misleading or untrue; and (3) one who makes a partial disclosure and conveys a false impression has a duty to correct it." *JSC Neftegas-Impex v. CITIBANK, NA,* 365 S.W.3d 387, 409 (Tex. App. -- Houston [1st Dist.] 2011, *pet. denied*).

97. Silence may be equivalent to a false representation when the particular circumstances impose a duty on the party to speak and the party nevertheless deliberately remains silent. *Bradford,* 48 S.W.3d at 755; *SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 353 (Tex. 1995).

98. Here, Martin voluntarily *and* partially disclosed specific information about the financial circumstances of Reach Construction – including the purported projects it had under contract (which itself was untrue), but he nevertheless failed to disclose any of the outstanding liabilities owed to vendors and subcontractors – many of which had specifically demanded payment that had become grossly overdue prior to the acquisition.

99. These voluntary and partial disclosures created the obligation on Martin to disclose the whole truth as it pertained to the financial circumstances of the Company, but he did not.

100.     Despite its due diligence, OEG was not in an equal position to discover the truth. Martin knew the status of unpaid sums owed to vendors and contractors, but never disclosed these to OEG when he provided the Second Accounting – nor at any other time during the negotiations.

101.     Indeed, these liabilities were never disclosed to OEG by Martin himself; instead OEG learned of these liabilities in piece-meal fashion each and every time a subcontractor or vendor demanded payment after the sale was completed.

102.     As a result, Martin knew OEG was ignorant as to these facts and OEG did not have an equal opportunity to discover the truth.

103.     OEG paid Martin a portion of the agreed-upon purchase price for Reach Construction based on the valuation and terms set forth and agreed to between the parties, the total sum of which was based on the profit margin Martin identified for fiscal year 2020.

104.     OEG is also liable to Martin for a subordinated loan to secure the purchase.

105.     But, none of the undisclosed liabilities (now paid or owed) were taken into account in the purchase price – which would have been adjusted downward to account for the same.

106.     Martin intentionally concealed or failed to disclose these liabilities despite a legal obligation to do so all whilst knowing OEG was ignorant of these facts and did not have an equal opportunity to discovery them.

107.     The purpose of his subterfuge was to induce OEG to purchase Reach Construction at an over-inflated value and, accordingly, OEG has been damaged in an amount (both actual and consequential) to be determined by the trier of fact.

### C.     Fraud in the Inducement

108.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

109.     As described above, Martin knew that he was intentionally, or without any knowledge about the truth, making representations about the number of contracted projects held by Reach Construction (and their profit margins) while also failing to disclose material liabilities held by it – information that was pertinent and relied upon by OEG when it decided to purchase the Company for the sum agreed upon by the parties.

110.     Martin's representations (and omissions) were made with the intent (or reckless disregard for the truth) that they should be acted upon by OEG.

111.     As set forth above, OEG acted in reliance on Martin's representations and material omissions for which he had a duty to disclose and thereby suffered damages for which it seeks monetary relief in the form of damages (both actual and consequential) in an amount to be determined by the trier of fact.

### D.     Negligent Misrepresentation

112.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

113.     The elements of negligent misrepresentation are (1) the representation is made by a defendant in the course of his business or in a transaction in which he has a pecuniary interest, (2) the defendant supplies "false information" for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App. -- Houston [1st Dist.] 2010, *pet. denied*).

114.     Martin negligently misrepresented both (1) the number of projects held "in contract" or which were to be completed in fiscal year 2020 and (2) the value of those projects as outlined in his Second Accounting.

115.    Without waiving the foregoing allegations of fraud, Martin's representations (and omissions) were made with the intent (or without the exercise of reasonable care or competence to obtain and communicate the information) that they should be acted upon by OEG.

116.    OEG acted in reliance on Martin's negligent representations and material omissions for which he had a duty to disclose and thereby suffered damages for which it seeks monetary relief in the form of damages (both actual and consequential) in an amount to be determined by the trier of fact.

### E.    Money Had And Received

117.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

118.    Pleading strictly in the alternative and without waiving any of the foregoing allegations, OEG pleads that it seeks damages for money had and received, which is an equitable action for restitution.

119.    This action lies whenever a defendant holds money that in equity and good conscience belongs to the plaintiff under the particular circumstances of a case.

120.    Plead in the alternative to the other claims made in this action, Martin has received money for the purchase price of Reach Construction and property that was not conveyed to OEG – including the alleged projects Martin claimed were under contract in the Second Accounting but were not – which has resulted in Martin receiving and keeping money that in all good conscience belongs to OEG.

121.    This money was obtained by and through Martin's misconduct, including but not limited to fraud and breach of contract.

122.    Accordingly, it is unconscionable for the money to be retained by Martin as it was received under false pretenses as set forth herein and such sums should be returned to OEG in the amount determined by the trier of fact.

### F.    Unjust Enrichment

123.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

124.    By fraudulently inducing OEG to purchase Reach Construction for an over-inflated price by virtue of misrepresenting the number of contracts held by Reach Construction (and the value of those contracts) and by failing to disclose the liabilities owed to third parties by the Company, Martin has been unjustly enriched.

125.    OEG has been damaged as a direct and proximate result of Martin's unjust retention of OEG's purchase money for Reach Construction.

126.    It would be unjust for Martin to be able to keep the benefits of the terms of the Agreement, which were wrongfully acquired and attained.

127.    As a result, Martin is liable to OEG for restitution of the benefits derived - the amount of which shall be determined by the trier of fact.

### G.    Breach of Contract

128.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

129.    Pleading strictly in the alternative and without waiving any of the foregoing allegations, Martin breached certain representations and warranties in the Agreement - including those set forth in Sections 3.06(c), 3.07, 3.11, and 3.26.

130.    Specifically, Martin was aware at the time of the purchase that certain projects were not, as represented by him, actually under contract with Reach Construction.

131.    Martin also was aware at the time of the purchase that there were existing threatened or actual claims and demands for payment of sums owed to numerous vendors and subcontractors by Reach Construction.

132.    Indeed, legal entanglements turned out to be the first thing OEG encountered after the sale, and the damages they proximately caused are Martin's to bear.

133.    If the representations and warranties described above, and made by Martin, were true, then there would have been no discrepancy as to the liabilities owed by Reach Construction to its vendors and subcontractors at the time of the sale.

134.    But, Martin hid these liabilities in an effort to inflate the purchase price in violation of the terms of the Agreement.

135.    Martin breached the terms of the Agreement and OEG has sustained substantial injury for which it seeks monetary relief in the form of damages (both actual and consequential) to be determined by the trier of fact.

### H.    Actual and Consequential Damages and Attorneys' Fees

136.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

137.    OEG seeks both its actual and consequential damages for Martin's misconduct.

138.    OEG agreed to pay $67,000,000 for Reach Construction – a number from which it valued the Company pursuant to a multiple of the falsely projected profits Martin represented the Company would generate in fiscal year 2020.

139.    OEG seeks by and from Martin a recovery of actual damages in the difference between what OEG was led to believe Reach Construction was worth and what Reach Construction was actually worth.

140.     OEG seeks by and from Martin the sums it paid to him for the purchase of Reach Construction.

141.     OEG seeks a declaration that the sums owed by it pursuant to the purchase agreement through subordinated loans have been satisfied and are no-longer owing.

142.     OEG seeks repayment of the $3,000,000.00 Bridge Note provided to Martin to settle debts owed by Reach Construction that has never been repaid.

143.     OEG also seeks an award of attorneys' fees – both with respect to this action and for the fees required to resolve the undisclosed claims and demands from subcontractors and vendors for unpaid invoices and other liabilities ignored by Reach Construction before the sale.

144.      OEG similarly seeks attorneys' fees pursuant to §38.001 of the Texas Civil Practice and Remedies Code for, among other conduct, Martin's breach of the representations and warranties set forth in the Agreement.

145.     Indeed, at the time of his execution, as set forth above, Martin knew that – at a minimum – the warranties and representations set out in Sections 3.06(c), 3.07, 3.11, and 3.26 were not true, but made them anyways.

## I.      Punitive/Exemplary Damages

146.     The preceding paragraphs are incorporated by reference as if fully set forth herein.

147.     Martin's misconduct was willful and wanton and/or was undertaken with reckless disregard as to OEG's rights and, accordingly, OEG is entitled to exemplary/punitive damages in an amount to be decided by the trier of fact.

148.     The exemplary/punitive damages sought are exempted from the limitations on such damages as set out in the Texas Civil Practice and Remedies Code § 41.008(a).

149.     As Martin engaged in intentional and knowing fraud to secure OEG's execution of the Agreement – conduct which may constitute a felony under the Texas Penal Code – §41.008(b)(11) exempts any statutory limitation placed on the punitive/exemplary damages awardable by the trier of fact in this case.

## VI.     PRAYER

For the foregoing reasons, OEG prays that Martin be commanded to appear and answer and that it be awarded the following relief, orders, and judgments from and against Martin:

a.     Actual, consequential and punitive/exemplary damages in an amount to be determined by the trier of fact;

b.     A declaration that any subordinated note due and owing to Martin by OEG has been satisfied;

c.     Plaintiff's costs and attorneys' fees for bringing suit;

d.     Prejudgment and post-judgment interest; and

e.     Any and all other relief, whether sounding in law or equity to which Plaintiff may be entitled in equity or law.

Respectfully submitted,

By:  */s/ Buena Vista Lyons*
      Buena Vista Lyons
      Texas Bar No. 00797630
      vlyons@fordharrison.com
      David R. Anderson*
      Georgia Bar No. 368564
      danderson@fordharrison.com
      *Admission Forthcoming*

**FORDHARRISON LLP**
1601 Elm Street, Suite 4450
Dallas, Texas  75201
Telephone:  (214) 256-4700
Facsimile:  (214) 256-4701

**ATTORNEYS FOR PLAINTIFF**
**ORBITAL ENERGY GROUP, INC.**
**F/K/A CUI GLOBAL, INC.**